745 N.W.2d 593 (2008)
16 Neb. App. 516
D B FEEDYARDS, INC., a Nebraska corporation, Appellee
v.
ENVIRONMENTAL SCIENCES, INC., a Nebraska corporation, and Kendall Bonenberger, Appellants.
No. A-06-471.
Court of Appeals of Nebraska.
March 4, 2008.
*597 William H. Selde, of Sodoro, Daly & Sodoro, P.C., Omaha, for appellants.
Jaron J. Bromm and Curtis A. Bromm, of Edstrom, Bromm, Lindahl & Freeman-Caddy, Wahoo, and, on brief, Donald G. Blankenau and Thomas R. Wilmoth, of Blackwell, Sanders, Peper & Martin, L.L.P., Lincoln, for appellee.
IRWIN, SIEVERS, and MOORE, Judges.
MOORE, Judge.

INTRODUCTION
D B Feedyards, Inc., filed a complaint setting forth claims for breach of contract, negligence, and breach of warranties in the district court for Burt County against Environmental Sciences, Inc. (ESI), and Kendall Bonenberger, the president of ESL The district court entered summary judgment in favor of D B Feedyards on its negligence claim. ESI and Bonenberger (hereinafter collectively the Appellants) appeal. For the reasons set forth herein, we affirm the grant of summary judgment on the issue of negligence, but we reverse, and remand for further proceedings on the issue of causation.

*598 BACKGROUND

Dispute.
D B Feedyards operates a cattle feedlot in Nebraska that feeds, on average, over 4,000 head of cattle. D B Feedyards received a letter from Nebraska's Department of Environmental Quality (DEQ) in May 2002, notifying it that a livestock waste control facility was required for its cattle operations. The DEQ required the facility permit application to be filed by December 1, 2002, On July 16, D B Feedyards retained ESI to perform various environmental consulting services and to prepare and submit to the DEQ, on behalf of D B Feedyards, the application for a permit to construct and operate a licensed waste control facility.
ESI missed multiple deadlines established by the DEQ for submission of the facility permit application. Although ESI submitted an application on March 27 or 28, 2003, the application was found incomplete by the DEQ and was returned to ESI. The DEQ required the complete application to be filed no later than October 21. ESI, however, failed to do so without explanation to the DEQ or to D B Feedyards. On December 23, ESI assured D B Feedyards that a complete application would be filed by mid-January 2004. ESI failed to do so and, in fact, never submitted a complete facility application to the DEQ for D B Feedyards.
On December 27, 2004, the U.S. Environmental Protection Agency (EPA) issued to D B Feedyards a compliance order and notice of violations of the federal Clean Water Act. The EPA threatened a fine of $157,500 for alleged violations commencing on April 24, 2003, the date the DEQ notified ESI that the facility permit application was incomplete. The EPA indicated that the failure to submit a timely permit application to the DEQ precipitated the penalty action. D B Feedyards settled the penalty action with the EPA on August 29, 2005, for $135,000. D B Feedyards incurred $15,799.50 in fees defending the EPA action. Following the EPA action, D B Feedyards terminated ,its relationship with ESI and hired another consultant to prepare and file the facility application. After paying $24,681.53 to ESI, D B Feedyards had to pay the new consultant $51,300 to perform the work ESI failed to do. D B Feedyards also paid a $1,500 application fee for the incomplete application submitted by ESI.

Procedural Background.
D B Feedyards filed a complaint in the district court against the Appellants on June 24, 2005. D B Feedyards set forth claims for breach of contract, negligence, and breach of warranties, and alleged damages of $207,300.
The Appellants answered on August 16, 2005. We do not set forth the details of the answer except to note ESI affirmatively alleged that it exercised a reasonable degree of knowledge and skill, the same as ordinarily possessed by others engaged in the business or trade, and that any claim of damage was the product of the actions of others not subject to the direct control of ESI.
On October 21, 2005, D B Feedyards filed a motion for summary judgment, which was heard by the court on December 5. At the hearing, the court received into evidence an affidavit of Rodney Bromm, the president and general manager of D B Feedyards; an affidavit of Dennis Grams, an environmental engineer and consultant; various documents from the DEQ file on D B Feedyards; and an affidavit of Bonenberger.
In Bromm's affidavit, he recited details of D B Feedyards' relationship with ESI and the action initiated by the EPA. Bromm stated that in response to the *599 May 2002 letter of the DEQ, he contacted ESI to perform various environmental consulting services. Bromm informed ESI of the DEQ letter, provided it with a copy, and inquired as to whether ESI had the requisite knowledge and abilities to perform the services required. Bromm stated that Bonenberger assured Bromm that he had significant experience in and specialized knowledge for preparing and submitting the necessary permit applications to comply with the DEQ letter.
Bromm stated that in hiring ESI to perform consulting services, ESI acknowledged to him that it was aware of the deadline given by the DEQ for submission of the permit application and gave no indication that it could not meet the deadline. Bromm contacted ESI several times in 2004 to inquire about the status of the permit application and was always assured that deadlines would be met. Bonenberger informed Bromm that ESI was waiting for Nebraska's Department of Natural Resources (DNR) to approve a dam safety permit application. In June 2004, D B Feedyards contacted the DNR and was informed that no such application had been submitted to the DNR on behalf of D B Feedyards. ESI then assured D B Feedyards that the dam safety permit application must have been lost or misplaced and that it would be filed immediately. ESI, however, never filed the application with the DNR.
Bromm stated that with respect to the action by the EPA, the EPA made clear, both in negotiations and in a consent agreement and final order filed August 29, 2005, that its decision to pursue an enforcement action against D B Feedyards was precipitated by the failure to file a timely waste control facility permit application with the DEQ.
Grams is a licensed professional engineer with over 30 years of experience in environmental engineering and consulting. Grams has been involved in the processing of hundreds of environmental permits from the DEQ and the EPA. Grams is the former regional administrator for the EPA region including Nebraska, Iowa, Missouri, and Kansas. Prior to occupying that position, Grams served as the director for the predecessor agency to the DEQ. In his affidavit, Grams explained that it is common for feedlot operators to rely on the expertise of environmental consultants when attempting to comply with state and federal environmental permitting requirements. Grams stated that a reasonable and prudent consultant understands that it is responsible for communicating with state and federal agencies during the environmental permitting process. Grams stated that a reasonable and prudent environmental consultant understands that the failure to comply with DEQ guidelines can result in significant civil, administrative, or even criminal penalties and does not consistently ignore deadlines imposed by state and federal environmental agencies. Grams opined that ESI's conduct in assisting D B Feedyards to file the permit application was simply unacceptable in the industry. Grams opined further that ESI failed in every respect to be reasonable or prudent by failing to communicate in a timely and truthful manner with the DEQ on behalf of D B Feedyards, failing to follow through on its promises to the DEQ, diminishing the DEQ's confidence in D B Feedyards' willingness to comply, failing to comply with the basic regulations to ensure that the application ESI filed was complete, and failing to file a complete application in a timely, manner.
Grams also expressed, based on his experience working for the EPA and the predecessor to the DEQ, his belief that the EPA generally uses enforcement actions as a last resort to bring about compliance *600 and that one of the most significant factors in determining whether an enforcement action is necessary is evidence of good faith efforts to timely meet agency demands, or lack thereof. Grams stated that when numerous deadlines are missed and communication with the agencies is sparse or nonexistent, as in this case, the agencies will turn to their last resort and file a civil penalty action to force compliance. Grams opined that the administrative penalty action in this case would not have been commenced if ESI would have filed an application with the DEQ in a timely manner.
In Bonenberger's affidavit, he stated that his understanding, after reviewing DEQ records, was that D B Feedyards was an entity with a long history of noncompliance with DEQ requirements dating back to 1989. Bonenberger alleged that all fines, sanctions, and/or penalties suffered by D B Feedyards were not the product of any actions, inactions, or activities of ESI and/or Bonenberger, but were a product of D B Feedyards' continued violations and noncompliance dating back to 1990. Bonenberger alleged, based upon his education, training, and experience, that if D B Feedyards had complied with a DEQ request from 1993, no damages, fines, and/or sanctions would have been imposed against D B Feedyards and ESI's services would not have been required.
Bonenberger stated that ESI became aware in December 2002 or January 2003 that due to the size of the proposed holding pond at D B Feedyards, an additional application was necessary for submission to the DNR. Bonenberger expressed his understanding that the livestock waste control facility application would be submitted to the DEQ and the DNR at the same time and that a consulting engineering firm, the Flatwater Group, Inc., was retained for D B Feedyards' engineering needs. Bonenberger stated that in March 2004, he met with "the consulting engineer" retained by ESI for the project on behalf of D B Feedyards and was informed that the engineer would promptly submit the revised application to the DEQ and the DNR to obtain a construction permit. Bonenberger stated that in approximately September 2004, the services of ESI were withdrawn and formally terminated, on the advice of. Bromm that D B Feedyards was still afforded time to submit an appropriate application for a construction permit to the DEQ.
Bonenberger alleged that all alleged damages suffered by D B Feedyards were not a product of any negligence on the part of ESI but were the proximate result of the acts and actions of D B Feedyards, its consultants, its engineers, and/or others prior to July 2002. Bonenberger stated that the EPA investigation found violations and sanctions which were totally unrelated to the services and/or contractual obligations of ESI to D B Feedyards and that half of all the recommendations made by the EPA were exclusive of services contemplated and/or included in the contractual and/or consulting agreement between EST and D B Feedyards.
Bonenberger opined, based upon his education, training, and experience as an environmental consultant, that the sole and proximate cause of any damages suffered by D B Feedyards was the result of the negligence of D B Feedyards, prior to any association with ESI, and/or the result of the negligence of D B Feedyards' consultants and others subsequent to the termination of the contractual relationship between the parties. Bonenberger alleged that it was not the duty or obligation of EST to obtain the DNR storage permit in March or April 2003, because this application and permit required the stamp of a registered professional engineer, "the *601 aforementioned Flatwater Group," which entity ESI could neither compel nor control in performing its function as a professional engineer. Bonenberger further alleged that the sole and proximate cause of any damages suffered by D B Feedyards was the negligence of the Flatwater Group in failing to timely compile and complete its engineering duties. Bonenberger opined that none of the ultimate sanctions rendered against D B Feedyards as a result of a May 2004 EPA inspection would have accrued but for D B Feedyards' continued and protracted failure to comply with the requirements of the Clean Water Act (hereinafter CWA), 33 U.S.C. § 1251 et seq. (2000), and/or title 130 of the rules and regulations of the DEQ. Finally, Bonenberger opined that the fine in the amount of $135,000 does not reflect fines or sanctions limited to the scope or term of employment or consulting services by or between the parties.
Documents from the EPA are attached to various affidavits in the record, including the inspection report of May 6, 2004; the compliance order and notice of violations filed December 27, 2004; and the consent agreement and final order filed August 29, 2005. A brief recitation of the statutory and regulatory provisions involved in this case, as gleaned from these documents, is helpful to understand this case. Section 1311(a) of the CWA prohibits the discharge of pollutants except in compliance with, inter alia, § 1342 of the CWA. Section 1342 provides that pollutants may be discharged only in accordance with the terms of a "National Pollutant Discharge Elimination System" permit issued pursuant to that section. "Pollutant" includes biological materials and agricultural waste discharged to water. The regulations promulgated to implement § 1342 define "animal feeding operations" that are covered by the CWA. The number of cattle confined and fed at D B Feedyards brings it under the CWA.
The foregoing `documents also state that D B Feedyards did not have adequate livestock waste controls, nor did it have a National Pollutant Discharge Elimination System permit. The only waste controls in place consisted of settling basins that discharge into a tributary of Bell Creek, which does come under the definition of "waters" governed by the CWA. A previous compliance order was issued by the DEQ in 1990, requiring D B Feedyards to submit a permit application for construction of wastewater controls. A permit application submitted in 1991 was incomplete, as were two subsequent applications. A construction permit submitted and issued in 1992 was revoked in 1994. The next permit application was March 28, 2003, the one submitted by ESI on behalf of D B Feedyards. The May 2004 inspection noted other areas of concern beyond the construction of livestock waste controls, including the need to maintain records of all precipitation events, to develop a plan relating to the storage of diesel fuel and gasoline tanks, and to develop and implement best management practices.
The EPA compliance order and notice of violations states, in part:
The ongoing flow of wastewater from [D B Feedyards] to Bell Creek and its unnamed tributary constitutes an unauthorized discharge of pollutants from a point source to waters of the United States. This, and [D B Feedyards'] failure to obtain a permit from [the] DEQ are violations of Sections [1311] and [1342] of the CWA.
(Emphasis supplied.)
The EPA consent agreement and final order states, in part:
Although [D B Feedyards] has submitted numerous applications to construct livestock waste controls, it has thus far *602 failed to submit a proper or complete application as directed by [the] DEQ. Most recently, [D B Feedyards'] consultant submitted a permit application on March 28, 2003. [D B Feedyards] and [the] consultant were notified by [the] DEQ that the March 28, 2003 application was incomplete on April 24, 2003. No new or corrected permit application has been submitted since that date. This failure was one of the factors that precipitated this action.
(Emphasis supplied.)
The district court entered an order on March 23, 2006, granting summary judgment in D B Feedyards' favor on its claim for negligence, and awarding damages of $229,561. We have set forth those portions of the district court's analysis necessary to our resolution of this appeal in the analysis section below.

Postjudgment Proceedings.
The Appellants filed their notice of appeal on April 21, 2006. Also on that date, the parties entered into a stipulation that the district court could enter an order extending the time for the Appellants to submit a supersedeas bond from April 21 to May 22, that the amount of the supersedeas bond should be $278,000, and that the supersedeas bond "[could] be provided by any insurer authorized to do business in the State of Nebraska." The district court entered an order on April 26, approving the stipulation and extending the filing deadline for the supersedeas bond from April 21 until May 22.
On May 22 or 23, 2006, the Appellants' counsel, who was out of town, was advised by the district court that in lieu of a supersedeas bond, the Appellants' insurance carrier had tendered a check in the amount of $278,000. On May 23, the Appellants' counsel requested counsel for D B Feedyards to agree to substitution of a cash deposit in lieu of a supersedeas bond, which request was denied by D B Feedyards' counsel on May 25. The Appellants gave notice on May 25 of filing a supersedeas cash deposit in lieu of a bond. The Appellants' counsel also contacted the court and was informed that the district judge was not available for a hearing on May 25 and would be unavailable for hearings until June, due to the Memorial Day holiday.
On May 31, 2006, D B Feedyards filed a motion seeking to declare the supersedeas bond untimely. On June 2, the Appellants filed a motion and order for supersedeas cash deposit in lieu of a bond. The district court heard oral argument on these motions on June 19 and, on July 20, entered an order finding that the Appellants had failed to supersede the judgment entered on March 23, as required by Neb.Rev.Stat. § 25-1916 (Cum. Supp. 2006).
The court entered an order on October 10, 2006, denying the Appellants' motion for reconsideration of its July 20 order. Also on October 10, the court entered an order granting D B Feedyards' application for disbursement of funds and disbursing funds totaling $236,845.25 to D B Feedyards, which amount represented the amount of judgment, plus interest and costs. The court ordered that the balance of the 8278,000 cheek of May 22 was to be disbursed to EST and its attorney.
D B Feedyards moved for summary dismissal of the appeal, asserting that the appeal is moot because the Appellants had voluntarily satisfied the judgment against them. We overruled the motion, but reserved the issue of mootness for disposition upon submission of the appeal.

ASSIGNMENT OF ERROR
The Appellants assert, consolidated and restated, that the district court erred in *603 granting summary judgment in favor of D B Feedyards.

STANDARD OF REVIEW
When a jurisdictional question does not involve a factual dispute, determination of the issue is a matter of law, which requires an appellate court to reach a conclusion independent from that of the trial court. Susan L. v. Steven L., 273 Neb. 24, 729 N.W.2d 35 (2007).
Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. Johnson v. Knox Cty. Partnership, 273 Neb. 123, 728 N.W.2d 101 (2007). In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. Id.

ANALYSIS

Mootness.
The law is clear that "`[w]hen an ordinary law action is pending in this court on appeal, and the parties by agreement settle and dispose of the whole controversy, it becomes, so far as this court is concerned, a moot case, and will not be further investigated, but will be dismissed.'" Hormandl v. Lecher Constr. Co., 231 Neb. 355, 357, 436 N.W.2d 188, 190 (1989), quoting Schlanbusch v. Schlanbusch, 103 Neb. 588, 173 N.W. 580 (1919). When a party voluntarily complies with the mandate of the trial court, satisfying the judgment, the appeal no longer presents an actual controversy, but an abstract question. Hormandl v. Lecher Constr. Co., supra. Accordingly, we must first determine the effect of the postjudgment proceedings in this. case.

Did Appellants Voluntarily Pay Judgment?
The rule in Nebraska is that payment of a judgment does not destroy the right to appeal when the record shows that the payment was coerced by legal process during the pendency of the appeal. Green v. Hall, 43 Neb. 275, 61 N.W. 605 (1895); Ray v. Sullivan, 5 Neb.App. 942, 568 N.W.2d 267 (1997). Payments have been found not to be voluntary when made to avoid a sale of property owned by the judgment debtor. See, Burke v. Dendinger, 120 Neb. 594, 234 N.W. 405 (1931); Green v. Hall, supra. Our rule requires a case-by-case examination of the facts. Ray v. Sullivan, supra. The burden falls to the appellant to demonstrate, by affidavit, that appellant's satisfaction of the judgment was not voluntary, but was instead the result of coercion by legal process. See id.
The Appellants argue that the trial court's order disbursing the funds intended to be the supersedeas bond/cash deposit was satisfaction by coercion of legal process. This argument is not necessarily persuasive, given that the coercion as alleged by the Appellants came after the "satisfaction of judgment." However, the Appellants have made a strong showing that satisfaction of the judgment was not voluntary. Counsel for the Appellants submitted an affidavit in opposition to the motion for summary dismissal, stating that he requested a supersedeas bond in the amount of $278,000 to be tendered to the clerk of the court on May 22, 2006, and that he was out of town on that date. The Appellants' counsel stated that he received a call from the clerk of the court on the afternoon of May 22 or the morning of *604 May 23, advising that in lieu of a supersedeas bond, a check from the Appellants' insurance carrier had been tendered in the amount of $278,000. The Appellants' counsel stated that he immediately communicated with counsel for D B Feedyards on May 23 and requested agreement to the substitution of a supersedeas cash deposit in lieu of a supersedeas bond. On May 25, he received a return call from D B Feedyards' counsel denying the request. The Appellants' counsel then "undertook proceedings" to file a supersedeas cash deposit in lieu of a supersedeas bond.
We find some guidance in La Borde v. Farmers' State Bank, 116 Neb. 33, 215 N.W. 559 (1927). In that case, shortly before death, the decedent changed the beneficiary of three insurance policies each worth $10,000 from his estate to his wife (appellant). The decedent died insolvent. Upon receipt of the insurance money, the appellant deposited it in the defendant bank, and the bank issued to her, against the deposit, a cashier's check for $20,000 and a draft for $10,000 drawn on a different bank. The executor of the will, on behalf of the decedent's creditors, brought an action against appellant and the defendant bank, seeking to have the change in beneficiary be decreed fraudulent as to the executor's creditors. The trial court found the change to be fraudulent, ordered that the transfer of such insurance should be canceled and set aside, and ordered the appellant and the bank pay $27,803.53 to the clerk of the court for the benefit of the estate. The record showed that after rendition of judgment and before an appeal was taken, the defendant bank paid $28,029.58 into the district court in accordance with the judgment and that the appellant objected and reserved an exception to the payment. The appellant appealed, and the executor filed a motion to dismiss the appeal based upon compliance with the judgment of the court. The Nebraska Supreme Court reasoned:
The appellant has shown no intention of abandoning her appeal, and we are satisfied that she did not intend that the payment of the money by the defendant bank into court should be regarded as a compliance on her part with the judgment of the court so as to deprive her of the right of appeal.
Id. at 38, 215 N.W. at 561.
In the instant case, neither the Appellants nor their counsel tendered the check to the court; rather, their insurance company erroneously submitted a check rather than a bond. This is not a situation where a party paid the judgment and then, having a change in mind, sought to appeal from the judgment. There is no doubt that the parties and the trial court were well aware that the Appellants intended to file a supersedeas bond of $278,000 on May 22, 2006. The actions of the Appellants' counsel upon learning of the mistakenly submitted check clearly demonstrate that the Appellants did not intend to abandon the appeal and did not intend the check to be considered compliance with the judgment.
The district court found that the Appellants did not file a supersedeas bond or a cash deposit with the clerk of the court, but that the Appellants' representatives submitted a check, containing no guarantee or certification and not deposited with any conditions. The district court also found that none of the subsequent filings met the statutory requirements to supersede judgment. These findings of the district court have not been raised on appeal, and we do not address them further in this opinion, other than to state that even if the attempt to supersede was invalid, that is a separate and distinct question from whether the appeal is moot because of the "voluntary" payment.
*605 In addition to the above-cited Nebraska case law, the following commentary is useful to our resolution of the question of whether the Appellants voluntarily paid the judgment:
While it is often said that a party who voluntarily satisfies a judgment may not appeal from that judgment, certain jurisdictions do not apply this rule where the payment of a judgment is not tendered as a compromise or settlement or under an agreement not to appeal, either on the ground that such payment is involuntary, or on the ground that such payment does not necessarily constitute waiver of the right to appeal, especially where repayment or restitution may be enforced, in the event of a reversal.
There is general agreement that the involuntary payment of a judgment does not preclude appeal; a judgment paid, in full or in part, under legal coercion remains ripe for judicial review. This rule applies in criminal as well as civil cases.
Also, an appeal is not barred by' a payment which does not fully satisfy the judgment, such as where there remains an issue as to the payment of attorney's fees, or where a judgment is only partially satisfied by execution. Moreover, the tender of payment by a third party who is not under the appellant's control does not indicate acceptance of the judgment, and thus does not bar the right of appeal.
5 Am.Jur.2d Appellate Review § 583 at 341-42 (2007).
Whether a payment is voluntary depends on the facts of the particular case as indicating an intention on the part of the payer to waive his or her legal rights. Thus, neither the mere statement of an intent not to waive the right of appeal, nor the failure to expressly reserve the right to appeal, necessarily determines whether a judgment was paid voluntarily.
. . . .
Voluntary satisfaction will not be found where payment was made in lieu of posting a supersedeas bond, nor where the appellee implicitly recognizes that payment was not voluntary by failing to move for dismissal of the appeal.
5 Am.Jur.2d, supra, § 584 at 342-43. See, also, Rosenblum v. Jacks or Better of Am. West, 745 S.W.2d 754 (Mo.App.1988) (payment did not moot appeal where appellees did not seek dismissal of appeal, payment did not fully satisfy judgment, and documents appended to appellant's brief reflected that payment was made in lieu of posting supersedeas bond or submitting to execution, and not voluntarily, in sense that payment was made so as to end matter).
The payment of a money judgment does not moot an appeal where repayment can be enforced, or where there is a remaining issue of contribution. However, an appeal can be rendered moot if execution of a judgment cannot be undone, such as where specific property is sold to third parties pursuant to a court order.
5 Am.Jur.2d, supra, § 608 at 362.
We conclude that the payment made in this case was not "voluntary" and thus does not moot the Appellants' appeal. The Appellants clearly intended to appeal. They sought and were granted permission to file a supersedeas bond in the amount of $278,000. The check tendered was for the exact amount of the supersedeas bond the Appellants' were seeking to file, rather than for the exact amount of the judgment, and was tendered not by the Appellants but by their insurance carrier. Once the mistake had been identified, the Appellants took prompt measures to remedy the situation, but the district court ultimately *606 denied their request and found that they had failed to supersede the judgment. This is not a situation where, if we were to find for the Appellants on appeal, repayment of the funds that the district court ordered to be disbursed to D B Feedyards cannot be enforced. Accordingly, we proceed to consider the merits of this appeal.

Was Summary Judgment Proper?
The district court found for D B Feedyards on its negligence claim. In order to prevail in a negligence action, a plaintiff must establish the defendant's duty to protect the plaintiff from injury, a failure to discharge that duty, and damages proximately caused by the failure to discharge that duty. National Am. Ins. Co. v. Constructors Bonding Co., 272 Neb. 169, 719 N.W.2d 297 (2006).
Whether a legal duty in negligence exists is a question of law. Moglia v. McNeil Co., 270 Neb. 241, 700 N.W.2d 608 (2005). in negligence cases, the duty is always the same, to conform to the legal standard of reasonable conduct in light of the apparent risk. Id. In determining whether a duty exists, an appellate court employs a risk-utility test, considering (1) the magnitude of the risk, (2) the relationship of the parties, (3) the nature of the attendant risk, (4) the opportunity and ability to exercise care, (5) the foreseeability of the harm, and (6) the policy interest in the proposed solution. Id. Once a court determines that a duty is owed by one party to another, it becomes necessary to define the scope and extent of the duty. Cerny v. Cedar Bluffs Jr./Sr. Pub. Sch., 262 Neb. 66, 628 N.W.2d 697 (2001). In other words, the necessary complement of dutythe standard of caremust be ascertained. Id. Determining the standard of care to be applied in a particular case is a question of law. Id. The Nebraska Supreme Court has stated that "[t]hat standard is typically general and objective and is often stated as the reasonably prudent person standard, or some variation thereof; i.e., what a reasonable person of ordinary prudence would have done in the same or similar circumstances." Id. at 73, 628 N.W.2d at 703-04.
This basic standard, however, is not invariably applied in all negligence cases. For example, the standard is modified in circumstances in which the alleged tort-feasor possesses special knowledge, skill, training, or experience pertaining to the conduct in question that is superior to that of the ordinary person. Such a person is not held to the standard of a reasonably prudent person, but, rather, to a standard consistent with his or her specialized knowledge, skill, and other qualities.
Id. at 73, 628 N.W.2d at 704.
The district court observed that D B Feedyards hired ESI to perform environmental consulting services, a skill ESI held itself out to possess. The court determined that the undisputed material facts demonstrated that ESI owed a duty to perform its services to D B Feedyards as a reasonable environmental consultant with specialized knowledge, skill, training, and experience would perform them under similar circumstances. We find no error in this conclusion by the district court. Grams expounded at length in his affidavit about the duty and standard of care owed by consultants such as. ESI in circumstances like those presented in this case, none of which information was rebutted by Bonenberger's affidavit.
The ultimate determination of whether a party deviated from the standard of care and was therefore negligent, is a question of fact. Cerny v. Cedar Bluffs Jr./Sr. Pub. Sch., supra. To resolve the issue, a finder of fact must determine what conduct the standard of care would require *607 under the particular circumstances presented by the evidence and whether the conduct of the alleged tort-feasor conformed with the standard. Id. D B Feedyards offered the affidavit of Grams to demonstrate what a reasonable environmental consultant would have done in the circumstances presented by this case. The district court determined that the Appellants offered no testimony or evidence to rebut the testimony of Grams. The district court found that in particular, Bonenberger failed to aver that he was familiar with the applicable standard of care, failed to offer any testimony as to what the applicable standard of care is, and failed to aver that the Appellants complied with the standard of care. The court found that the undisputed material facts demonstrate that the Appellants failed to comply with the standard of care by failing to communicate in a timely manner with the DEQ on behalf of D B Feedyards; failing to comply with DEQ regulations to ensure that the application filed on March 28, 2003, was complete; and failing to file a complete application by October 21, 2003. We find no error in the district court's determination in this regard.
A party moving for summary judgment must make a prima facie case by producing enough evidence to demonstrate that the movant is entitled to judgment if the evidence were uncontroverted at trial. Pogge v. American Fam. Mut. Ins. Co., 272 Neb. 554, 723 N.W.2d 334 (2006). Once the moving party makes a prima facie case, the burden to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law shifts to the party opposing the motion. Id. We conclude that the entry of summary judgment was appropriate with regard to the district court's findings that the Appellants breached the duty of cared owed to D B Feedyards.
We determine that there are disputed questions of material fact relating to the issue of causation which preclude summary judgment on the issue of damages. The burden of tying the negligence to the damage claimed remains on the claimant even when the other party is guilty of negligence as a matter of law. See Beavers v. Christensen, 176 Neb. 162, 125 N.W.2d 551 (1963). A proximate cause is a cause that (1) produces a result in a natural and continuous sequence and (2) without which the result would not have occurred. Staley v. City of Omaha, 271 Neb. 543, 713 N.W.2d 457 (2006). A defendant's conduct is a proximate cause of an event if the event would not have occurred but for that conduct, but it is not a proximate cause if the event would have occurred without that conduct. Worth v. Kolbeck, 273 Neb. 163, 728 N.W.2d 282 (2007). A proximate cause need not be the sole cause; it need only be "a" proximate cause. See, Meyer v. State, 264 Neb. 545, 650 N.W.2d 459 (2002); Fackler v. Genetzky, 263 Neb. 68, 638 N.W.2d 521 (2002). The question of proximate cause, in the face, of conflicting evidence, is ordinarily one for the trier of fact, and the court's determination will not be set aside unless clearly wrong. Staley v. City of Omaha, supra.
In finding that EST's negligence proximately caused D B Feedyards' injury, the district court noted that after EST failed to complete the permit application, the EPA initiated an enforcement action against D B Feedyards. The court found that the resulting fine was for discharges that would have been authorized had EST filed the permit application in a timely manner. The court also relied on Grams' affidavit statement that the EPA would not have initiated an enforcement action if a timely permit application had been filed and that one of the most significant factors in determining *608 whether to bring an enforcement action is evidence of good faith efforts to timely meet the agency's demands. The court determined that the undisputed evidence offered by D B Feedyards, even viewed in a light most favorable to the Appellants, supported no other conclusion.
The district court determined that the foregoing established a prima facie case that ESI's breach was the "sole and proximate cause" of the damages incurred by D B Feedyards and that the only evidence offered by the Appellants supported, rather than contradicted, this conclusion. Our review of the evidence, viewed in the light most favorable to the Appellants, leads us to conclude that the. Appellants produced sufficient evidence to show the existence of a material issue of fact concerning the issue of causation.
Bonenberger, who reviewed the DEQ file on D B Feedyards in preparation for his affidavit statements and who certainly has some training, skill, and expertise in the area of environmental consultancy, stated that half of the findings, recommendations, and/or conclusions in the EPA inspection report of May 2004 were exclusive of the services contemplated and/or included in the contractual and/or consulting agreement between the parties. Bonenberger further stated, based upon his education, training, and experience as an environmental consultant that the fine imposed of $135,000 does not reflect fines or sanctions limited to the scope or term of employment of EST by D B Feedyards.
The documents from the EPA indicate that it was D B Feedyards' continued unauthorized discharge of pollutants and the failure to submit a proper or complete application that precipitated the enforcement action. Further, the failure to submit a proper permit application was noted as one of the factors that precipitated the action. In other words, on this record, there is a question of fact as to whether the Appellants' failure to submit the permit was a proximate cause of all of the damages resulting from the EPA enforcement action.
The district court also discussed Bonenberger's assertions that the proximate cause of D B Feedyards' damages was the negligence of the Flatwater Group in failing to timely compile and complete its engineering duties. Because we find that a genuine issue of material fact exists regarding causation, which requires further proceedings, we do not address further the issue of causation relative to the Flatwater Group. An appellate court is not obligated to engage in an analysis that is not needed to adjudicate the controversy before it. Fokken v. Steichen, 274 Neb. 743, 744 N.W.2d 34 (2008).
We conclude that the evidence submitted by the Appellants, when viewed in the light most favorable to the Appellants and giving them the benefit of all reasonable inferences deducible from the evidence, was sufficient to raise a genuine issue of material fact as to the causation of the damages suffered by D B Feedyards as a result of ESI's negligence. Accordingly, summary judgment on the issue of causation of damages was not proper.

CONCLUSION
We find that the Appellants did not voluntarily satisfy judgment so as to moot this appeal. We further find that the district court was correct in granting summary judgment on the issue of negligence but erred in granting summary judgment on the issue of causation. Accordingly, we affirm the summary judgment in favor of D B Feedyards and against the Appellants with regard to the issue of EST's negligence; however, we reverse, and remand *609 for further proceedings on the issue of causation.
AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.