IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

REED V. STATE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

DOMINIQUE LACURTIS REED, SPECIAL ADMINISTRATOR OF THE
ESTATE OF DARRYL C. REED, DECEASED, APPELLANT,
V.
STATE OF NEBRASKA, APPELLEE.

Filed June 10, 2014.    No. A-13-393.

Appeal from the District Court for Lancaster County: JOHN A. COLBORN, Judge. Affirmed.

Michael A. Nelsen, of Marks, Clare & Richards, L.L.C., and Leonard W. Shefren, of Shefren Law Offices, P.C., L.L.O., for appellant.

Jon Bruning, Attorney General, and Amie Larson for appellee.

MOORE, PIRTLE, and RIEDMANN, Judges.

MOORE, Judge.

## I. INTRODUCTION

Dominique LaCurtis Reed (the Appellant), special administrator for the estate of his deceased father, Darryl C. Reed (Reed), appeals from the order of the district court for Lancaster County which entered judgment for the State of Nebraska in this action for Reed's wrongful death and conscious pain and suffering. Because the district court's findings that the Appellant failed to meet his burden of proving that Reed's pain, suffering, and death were proximately caused by the negligence of the State were not clearly erroneous, we affirm.

## II. BACKGROUND

On November 11, 2011, the Appellant filed a complaint for Reed's wrongful death and conscious pain and suffering on behalf of Reed, Reed's estate, and certain known members of Reed's next of kin pursuant to Neb. Rev. Stat. § 30-809 (Reissue 2008) and the Nebraska State

- 1 -

Tort Claims Act, Neb. Rev. Stat. §§ 81-8,209 et seq. (Reissue 2008 & Cum. Supp. 2010). At the time of his death, Reed was a prisoner in the custody of the State. The Appellant alleged that Reed's injuries, damages, and death were proximately caused by Dr. John M. Casebolt, a Nebraska Department of Correctional Services (the Department) employee, in that Casebolt (1) failed to properly and timely diagnose and treat Reed's condition, (2) failed to properly treat Reed in such a manner as to prevent the onset of a fatal pulmonary embolism, (3) released Reed from his care without having provided proper and sufficient care or treatment, and (4) failed to properly test concerning Reed's presenting signs and symptoms. The Appellant sought damages for the value of the loss of companionship, counseling, and advice that Reed would have given to his children had he lived and the conscious pain and suffering Reed experienced prior to his death, as well as for Reed's medical bills and funeral expenses.

A bench trial was held on March 25 and 26, 2013. The court received various documentary exhibits, including a factual stipulation from the parties, and heard testimony from Casebolt, the parties' experts, three nurses who cared for Reed, the Appellant, Reed's daughter, and a Department records administrator.

Reed's sentence of incarceration with the Department began on January 28, 2010, and his projected release date was September 15, 2012. At the time of his death, Reed was assigned to the Community Corrections Center in Lincoln, Nebraska (CCC-L), which is a part of the Department's work release program. The work release program allows a select group of inmates to be employed in the community and housed during nonworking hours in the institutions.

On November 1, 2010, at approximately 2:20 p.m., Reed was taken from CCC-L to the Diagnostic and Evaluation Center Hospital (DEC Hospital). Upon Reed's arrival, nurse Ann Harker took Reed's vital signs and prepared a chart. The chart shows that Reed was taking blood pressure medication. Upon admission, Reed's vital signs were normal except for a very slightly elevated diastolic blood pressure reading. Reed's breathing sounds on the left and right were clear, and his respirations were shallow. Reed complained of intermittent chest pain. According to the admission form notes, Reed stated that he had intermittent midsternum pain, occurring every 2 to 3 hours, which began at 3:30 a.m. Harker observed Reed in a wheelchair at 2:50 p.m. prior to when he was moved to his assigned room. Harker informed Casebolt of Reed's vital signs and complaint of chest pain. At approximately 3 p.m., during afternoon hospital rounds, Casebolt was asked by the nursing staff to initiate a drug screen for Reed. Casebolt observed Reed, who was sitting in a chair, from a distance. According to Casebolt, Reed seemed totally at ease and in no distress whatsoever. Casebolt did not talk to Reed or perform a physical examination. Casebolt admitted Reed to the DEC Hospital for a 24-hour observation period due to his complaint of intermittent chest pain and ordered that a urinalysis be performed to check for drugs. Casebolt did not order any tests other than the urine test.

Between 3 and 4 p.m., Reed slept or rested in his bed. At 4:40 p.m., Reed was awakened for a meal and ate 95 percent of it. Reed had no complaints at that time and returned to sleep. At 7:20 p.m., Reed complained to nurse Diana Nelson that he was experiencing sternal burning and rated his pain at 9 on a scale of 1 to 10. Nelson checked Reed's vital signs and elevated the head of Reed's bed. Reed's temperature was 98.5, his pulse 110, his blood pressure 117/84, and his oxygen saturation level 91 percent. Reed stated that he felt better after the head of his bed was elevated. At 8:15 p.m., Reed reported that his pain was decreasing but that he continued to have

burning in his sternum. The nurse's notes state that he was smiling and socializing with DEC Hospital staff. At 9 p.m., Nelson observed that Reed was sleeping quietly. At 11:50 p.m., nurse Reginald Smith observed Reed to be resting in his room with no medical complaints and showing no signs of acute distress.

On November 2, 2010, at 2:50 a.m., Smith responded to Reed's call light. Smith observed that Reed was restless and moving around uncomfortably on his bed. At approximately 3 a.m., Reed's blood oxygen level suddenly dropped. Based on the abnormal oximeter reading, Smith applied an oxygen mask, but Reed would not keep the mask on. Smith was unable to take any other vital signs due to Reed's constant movement. Shortly thereafter, Smith directed security staff to call the 911 emergency dispatch service, which led to an ambulance being summoned to transport Reed to BryanLGH West Hospital (BryanLGH). Smith also directed security staff to bring the nurse's emergency bag, including the automatic external defibrillator, which was prepared for possible use. At approximately 3:25 a.m., emergency personnel arrived and Reed walked unassisted to the emergency gurney. Reed left the DEC Hospital at approximately 3:30 a.m. with emergency personnel and died at BryanLGH at 4:07 a.m. DEC Hospital medical staff informed Casebolt of the 911 call and the emergency transport of Reed to BryanLGH. An autopsy later determined that his death was attributed to "hypertensive heart disease and coronary atherosclerosis, with antemortem pulmonary emboli contributing." The urinalysis test did not reveal the presence of drugs.

Dr. James Elston, a retired obstetrician gynecologist, testified for the Appellant. Elston testified that a pulmonary embolus was the cause of Reed's death. Elston noted the heart problems revealed in Reed's autopsy and testified that these problems showed that Reed was predisposed to pulmonary embolism. Elston opined that Casebolt breached the standard of care in this case. Specifically, Elston testified that Casebolt provided substandard care by failing to take a medical history, review prior medical records, and perform a physical examination. Elston stated that a physician providing the proper standard of care would have responded to Reed's demonstrated symptoms--specifically, prolonged chest pains, sweating, nausea, and breathing difficulties--by immediately transferring him to a hospital where an EKG and chest x ray could have been performed. When asked whether Reed experienced conscious pain or suffering, Elston testified that Reed definitely had severe pain and was uncomfortable and that he should have been given a pain killer medication to relieve his suffering. Elston was very concerned, given the symptoms exhibited by Reed, that he was allowed to walk unaided to the gurney when emergency personnel arrived. Elston found this reflective of the level of care. Elston testified, "I think he had very severe symptoms, very serious symptoms, and they missed [the standard of care] by a large margin."

Elston testified concerning the causes, diagnosis, and treatment of pulmonary emboli. According to Elston, there are a multitude of causes for pulmonary emboli, including postoperative blood clots. Elston testified that heart disease and hypertension are also associated with pulmonary embolism. Elston testified that an EKG or chest x ray "could very well" show changes indicating a pulmonary embolism. He testified that a CT scan "would be more indefinite" and that cardiovascular or radioactive studies "would define it." According to Elston, the DEC Hospital did have EKG and x-ray equipment, but they were "not in service." He

testified that pulmonary emboli are treated in a variety of ways, including giving anticoagulant drugs to thin the blood and break up clots.

With respect to the causal connection between Casebolt's alleged deviation from the standard of care and Reed's death, Elston's testimony generally reflects his opinion that the pulmonary emboli suffered by Reed could have been diagnosed and treated, and Reed's life would have been saved, had Casebolt sent him to BryanLGH earlier. According to Elston, when Reed was brought to the DEC Hospital, he was exhibiting "symptoms of some very serious conditions." He testified that Reed's symptoms were serious and could have indicated a number of things, including pulmonary embolism, coronary artery disease, or aortic aneurism. Elston testified that even if Reed was not sent to another hospital for evaluation when he presented at the DEC Hospital, he should have been sent elsewhere for treatment at 7:20 p.m. when he complained of sternal pain rated 9 on a scale of 1 to 10.

Dr. Randy Kohl, the medical director for the Department, testified for the State. Kohl described a pulmonary embolism as "any material in the vascular bed that is going to the lung fields," such as a blood clot, air, a tumor, or fatty material that has broken loose and "flown through the vasculature to the lung fields." The most common cause is a blood clot that has been released from the lower extremities. Symptoms of a pulmonary embolism include dyspnea, which is labored, difficult breathing, or pleuritic-type chest pain. Other signs and symptoms include coughing, wheezing, hemoptysis (coughing up blood), tachycardia (elevated heart rate), tachypnea (rapid breathing), or drop in blood pressure. Kohl testified that chest pain could be caused by a pulmonary embolism but that it was "not high on the list" as a possibility. It is possible to have a pulmonary embolism and not exhibit any signs or symptoms. According to Kohl, a pulmonary embolism is very difficult to diagnose because the signs and symptoms are nonspecific, variable, and very common in people who do not have a pulmonary embolism. Heart attacks, congestive heart failure, and even panic attacks share some of the same symptoms. According to Kohl, once emergency personnel arrive on the scene, they make the decisions for a patient, including whether to have a patient walk unassisted to the gurney. With respect to Reed's transfer, Kohl was surprised he was allowed to walk unassisted given his symptomology. Kohl testified, "Obviously [emergency personnel] assessment at that point in time was that apparently he was not in very severe distress, otherwise I would not think that they would have him do that." Kohl opined that Reed's death was caused by acute massive multiple pulmonary emboli. He testified that an EKG or chest x ray taken at any point on November 1 or 2 may or may not have shown the presence of pulmonary emboli. Kohl testified that it was unknown whether the administration of blood thinners would have prevented Reed's death. He testified that nothing Casebolt did or did not do resulted in Reed's death.

On April 25, 2013, the district court entered an order, finding in favor of the State and dismissing the Appellant's complaint. After making certain findings of fact and reviewing applicable medical malpractice and negligence case law, the court concluded that the Appellant failed to meet his burden of proving by the greater weight of the evidence that Casebolt's actions or omissions were the proximate cause of Reed's death. The court stated, "The [Appellant] has not proven by credible evidence that, but for the actions and omissions of . . . Casebolt, . . . Reed would either not have had pulmonary emboli or that the pulmonary emboli would not have resulted in death." The court further stated:

[The Appellant] has not proven by the greater weight of evidence that . . . had . . . Casebolt sent . . . Reed to [BryanLGH] when he first arrived at DEC Hospital, doctors at [BryanLGH] would have performed certain tests, properly diagnosed and treated his condition, and prevented his death. No testimony was offered to show at what point the pulmonary emboli occurred or at what point the pulmonary emboli would have been detectable through EKG, chest X-ray, or other image. Stated another way, no credible evidence was presented to establish that, had doctors at [BryanLGH] performed tests on the afternoon of November 1, they would have been able to diagnose . . . Reed as having pulmonary emboli, or determine that he was about to have pulmonary emboli. In fact, . . . Kohl testified that an EKG or chest X-ray taken at any point on November 1 or 2 may or may not have shown the presence of pulmonary emboli. The [Appellant] has failed to meet his burden of proof to establish that there was more than a mere possibility that any type of treatment would have been effective in treating the pulmonary emboli and would have been able to prevent . . . Reed's death. The evidence offered by the [Appellant] was insufficient to lead the court to the conclusion that there was more than a mere possibility that . . . Reed's life would have been saved had . . . Casebolt acted differently. . . . Kohl testified that the actions or omissions of . . . Casebolt did not cause . . . Reed's death. [The Appellant's] proof is too speculative to establish when or if the pulmonary emboli could have been diagnosed. In fact, there is no evidence as to the cause of the pulmonary emboli- i.e. deep vein thrombosis, a fatty clot, or heart disease. Additionally, the [Appellant's] proof is too speculative to establish that the life of . . . Reed could have been saved once the pulmonary emboli could have been diagnosed.

The court found that the Appellant also failed to establish by the greater weight of the evidence that any pain or suffering experienced by Reed was the result of substandard care. The court noted the record of Reed's intermittent pain until approximately 2:50 a.m. on November 2, 2010. The court found the evidence insufficient to show that Reed experienced any type of sustained pain or suffering prior to leaving the DEC Hospital. The court also found that the Appellant failed to meet his burden of proof as to the cause of Reed's pain. The court noted Elston's testimony that Reed should have been given a pain killer, but the court found it unreasonable to believe that a pain killer should be prescribed every time a patient complains of acid indigestion, heart burn, or chest pain. The court concluded that the Appellant failed to establish that the standard of care would require prescribing pain killers and failed to prove that any of the pain or suffering experienced by Reed resulted from Casebolt's negligence. The court found in favor of the State and dismissed the Appellant's complaint. The Appellant subsequently perfected his appeal to this court.

## III. ASSIGNMENTS OF ERROR

The Appellant asserts that the district court erred in (1) failing to find that the medical malpractice attributed to the State was the proximate cause of conscious pain and suffering by, and the death of, Reed and (2) requiring an impossible burden of proof with respect to the elements of medical malpractice in Nebraska.

## IV. STANDARD OF REVIEW

A district court's findings of fact in a proceeding under the State Tort Claims Act will not be set aside unless such findings are clearly erroneous. *Cotton v. State*, 281 Neb. 789, 810 N.W.2d 132 (2011).

## V. ANALYSIS

### 1. PROXIMATE CAUSE FINDINGS

#### (a) Wrongful Death Claim

The Appellant asserts that the district court erred in failing to find that medical malpractice attributed to the State was the proximate cause of Reed's death.

Section 30-809(1) provides:

> Whenever the death of a person, including an unborn child in utero at any stage of gestation, is caused by the wrongful act, neglect, or default of any person, company, or corporation, and the act, neglect, or default is such as would, if death had not ensued, have entitled the person injured to maintain an action and recover damages in respect thereof, then, and in every such case, the person who, or company or corporation which, would have been liable if death had not ensued, is liable in an action for damages, notwithstanding the death of the person injured, and although the death was caused under such circumstances as amount in law to felony.

Section 30-809 is intended to authorize an action to recover damages from a tort-feasor for negligence or some other action resulting in the death of another person. *Olsen v. Farm Bureau Ins. Co.*, 259 Neb. 329, 609 N.W.2d 664 (2000).

The wrongful death action in this case is based on Casebolt's alleged medical malpractice. To make a prima facie case of medical malpractice, a plaintiff must show (1) the applicable standard of care, (2) that the defendant deviated from that standard of care, and (3) that this deviation was the proximate cause of the plaintiff's harm. *Olson v. Wrenshall*, 284 Neb. 445, 822 N.W.2d 336 (2012). The question then in this case is whether Casebolt's alleged deviation from the standard of care was the proximate cause of Reed's death.

A defendant's negligence is not actionable unless it is a proximate cause of the plaintiff's injuries or is a cause that proximately contributed to them. *Hamilton v. Bares*, 267 Neb. 816, 678 N.W.2d 74 (2004). In the medical malpractice context, the element of proximate causation requires proof that the physician's deviation from the standard of care caused or contributed to the injury or damage to the plaintiff. *Thone v. Regional West Med. Ctr.*, 275 Neb. 238, 745 N.W.2d 898 (2008). To establish proximate cause, the plaintiff must meet three basic requirements. *Latzel v. Bartek*, 288 Neb. 1, ___ N.W.2d ___ (2014). First, without the negligent action, the injury would not have occurred, commonly known as the "but for" rule. *Id.* Second, the injury was a natural and probable result of the negligence. *Id.* Third, there was no efficient intervening cause. *Id.*

The evidence is clear that the medical reason for Reed's death was pulmonary emboli. Elston testified that Casebolt breached the standard of care by failing to do a number of things, including failing to take a medical history, failing to perform a physical examination, and failing

to send Reed much sooner to a location where tests such as an EKG or chest x ray could have been administered. Elston testified that Reed demonstrated symptoms of pulmonary embolism, that a pulmonary embolism can be detected through tests such as an EKG or chest x ray, and that if Reed had been sent to BryanLGH sooner, the pulmonary emboli could have been diagnosed and treated and Reed's life saved. In contrast, Kohl testified that Casebolt's acts or omissions did not cause Reed's death. He testified further that an EKG or chest x ray taken at any point on November 1 or 2 may or may not have shown the presence of pulmonary emboli. He testified that the symptoms exhibited by Reed were indicative of a wide range of conditions, that chest pain is not "high on the list" as an indicator of a pulmonary embolism, and that a pulmonary embolism is very difficult to diagnose due to the nonspecific and variable signs and symptoms. Kohl testified that it was unknown whether the administration of blood thinners, one of the treatments recommended by Elston, would have prevented Reed's death.

Elston and Kohl provided conflicting evidence on the issue of proximate cause. The district court relied on Kohl's testimony in finding that the Appellant had failed to meet his burden of proving that Casebolt's alleged deviation from the standard of care was the proximate cause of Reed's death. The question of proximate cause, in the face of conflicting evidence, is ordinarily one for the trier of fact, and the court's determination will not be set aside unless clearly wrong. *D B Feedyards v. Environmental Sciences*, 16 Neb. App. 516, 745 N.W.2d 593 (2008). The court found that the Appellant had not presented credible evidence that "but for the actions and omissions of . . . Casebolt, . . . Reed would either not have had pulmonary emboli or that the pulmonary emboli would not have resulted in death." We read this as a finding that the Appellant did not present credible evidence that Casebolt's alleged deviation from the standard of care was the proximate cause of Reed's death. In a bench trial of an action at law, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Henderson v. City of Columbus*, 285 Neb. 482, 827 N.W.2d 486 (2013). The court's determination with respect to the proximate cause of Reed's death is not clearly erroneous. This assignment of error is without merit.

(b) Conscious Pain and
Suffering Claim

The Appellant asserts that the district court erred in failing to find that medical malpractice attributed to the State was the proximate cause of Reed's conscious pain and suffering.

A separate action on behalf of the decedent's estate for conscious pain and suffering experienced before death, medical expenses, and funeral and burial expenses may be joined as a separate cause of action in an action for wrongful death. See, *Reiser v. Coburn*, 255 Neb. 655, 587 N.W.2d 336 (1998); *Nelson v. Dolan*, 230 Neb. 848, 434 N.W.2d 25 (1989). The Appellant's claim for Reed's conscious pain and suffering is based on Casebolt's alleged medical malpractice. We have set forth the elements of medical malpractice and the requirements of proximate cause above and do not repeat them here.

In awarding damages for physical discomfort and mental anguish, the fact finder must rely upon the totality of the circumstances surrounding the incident. *Scott v. Khan*, 18 Neb. App. 600, 790 N.W.2d 9 (2010).

The district court found insufficient evidence that any pain or suffering experienced by Reed was the result of substandard care or that any of the pain or suffering experienced by Reed was the result of Casebolt's negligence. The record shows that Reed was experiencing intermittent chest pain when he was admitted to the DEC Hospital, that he rested or slept through the afternoon, that the sternal burning or pain he complained of at 7:20 p.m. was alleviated when the nurse elevated the head of his bed, that he was resting or sleeping quietly during the evening, and that when he activated his call light in the early morning hours of November 2, emergency personnel were summoned. Elston testified that Reed should have been given pain medication, but he did not proffer an actual causation opinion with respect to Reed's pain and suffering. We find no clear error in the court's finding with respect to the proximate cause of any pain and suffering experienced by Reed.

## 2. IMPROPER BURDEN OF PROOF

The Appellant assigns as error that the district court applied an improper burden of proof with respect to the elements of medical malpractice. The Appellant specifically takes issue with three of the district court's findings. First, the Appellant challenges the district court's finding that the Appellant failed to prove that had Casebolt sent Reed to BryanLGH when he first arrived at the DEC Hospital, doctors at BryanLGH would have performed certain tests, properly diagnosed and treated his condition, and prevented his death. The Appellant argues that this imposes an impossible burden because it is impossible to prove what doctors at BryanLGH would have done because Casebolt never sent Reed there. Second, the Appellant challenges the court's finding that no testimony was offered to show at what point the pulmonary emboli occurred or when they could have been detectable through EKG, chest x ray, or other imaging. The Appellant argues again that this is impossible to prove because Casebolt and other DEC Hospital employees did not do these things. Finally, the Appellant takes issue with the court's finding that there was no evidence as to the specific cause of the pulmonary emboli.

We do not view the district court's findings as imposing an impossible burden on the Appellant. The court correctly noted the elements of medical malpractice and the requirements of proximate cause. We read the court's findings as a determination with respect to the weight and credibility of the Appellant's evidence as it relates to the issue of causation. This assigned error is without merit.

## VI. CONCLUSION

The district court's findings that the Appellant failed to meet his burden of proving that Reed's pain, suffering, and death were proximately caused by the negligence of the State were not clearly erroneous. The court did not apply an improper burden of proof with respect to the elements of medical malpractice.

AFFIRMED.