IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


PETERSEN V. PETERSEN


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


ANITA J. PETERSEN, APPELLEE,

V.

TIMOTHY G. PETERSEN, APPELLANT.


Filed November 19, 2024.    No. A-23-834.


Appeal from the District Court for Buffalo County: JOHN H. MARSH, Judge. Affirmed as modified.

Jonathan R. Brandt and Alyssa R. Slama, of Klein, Brewster, Brandt & Messersmith, for appellant.

Bradley D. Holbrook and Samantha J. Merrill, of Jacobsen, Orr, Lindstrom & Holbrook, P.C., L.L.O., for appellee.


RIEDMANN, Chief Judge, and MOORE and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Timothy G. Petersen appeals from a decree entered by the Buffalo County District Court dissolving his marriage to Anita J. Petersen. Timothy and Anita had no children together, but each had children from previous marriages; all of the children were adults at the time of trial. Prior to marrying Anita, Timothy owned, in whole or in part, numerous parcels of agricultural land that he used in his farming and ranching operations. Following a 2-day trial, the district court concluded that Timothy had not rebutted the presumption that the increased appreciation on his premarital assets was marital. Timothy was ordered to pay to Anita an equalization judgment of $3,277,101.89, a significant part of which was attributable to increased values in the real estate Timothy owned prior to the marriage. Following motions to alter or amend filed by both parties,

Timothy's judgment was reduced to $3,201,587.87. Finding plain error in the court's calculations related to some of Timothy's premarital equity, we affirm as modified.

## II. BACKGROUND

Timothy and Anita met on a "Farmers Only" online dating service and were married in December 2008 in Las Vegas, Nevada. Anita moved out of the parties' home on January 6, 2020, and filed a complaint for dissolution of marriage a few days later. She requested an equitable division of the parties' property and debts, alimony, attorney fees, and court costs. Timothy filed a responsive pleading also seeking to have their marriage dissolved.

Trial took place on May 3 and 4, 2023. Both parties testified, and numerous exhibits were received into evidence. Anita called a real estate appraiser to testify as an expert witness. Timothy called a valuation analyst, but after concluding the witness failed to meet the standards established for an expert witness, the district court sustained Anita's counsel's "objection on Rule 702." See Neb. Rev. Stat. § 27-702 (Reissue 2016) (if scientific, technical, or other specialized knowledge will assist trier of fact to understand evidence or to determine fact in issue, witness qualified as expert by knowledge, skill, experience, training, or education, may testify thereto in form of opinion or otherwise).

The following evidence was presented at trial. Additional relevant facts are set forth in our analysis below.

Both parties held post-secondary degrees at the time of their marriage. After graduating from college, Timothy served in the Navy and then returned to Nebraska in the early 1990s to begin farming and ranching with his father. He farmed several parcels of owned and leased ground. Towards the end of his marriage to Anita, Timothy began to involve his sons in the farming operation. According to the parties, this was one of the main sources of contention between them. Anita objected to Timothy's older son being involved in the farming operation because "[t]his was our farming operation" and she and Timothy were "responsible for the expenses, the debt, the income." It was also her position that Timothy's older son, who subsequently moved into the family's farmhouse, should have been paying rent to Timothy and her because "it's an asset." After the parties separated, Anita was concerned that Timothy was not farming all the real estate previously farmed. She learned that Timothy had given 500 acres to his older son to farm, which Anita said, "[c]uts down the income quite a bit," but she could not give a "specific number." According to Timothy, he had "stated from the beginning" of their marriage that he wanted to "hand over" his farming operation to his "kids like [he] had farmed with [his] father," and Anita did not want that to happen. He claimed that she wanted to make his son "pay so much that he wouldn't be able to . . . make a living doing it," and Timothy wanted to help him get started.

Anita worked part time at the Buffalo County Surveyor's Office, a position she held before, during, and after her marriage to Timothy. The parties purchased a townhome in Kearney, Nebraska, in 2011. According to Anita, since she worked in Kearney and her son was in high school at that time, "it was just easier" to be in Kearney for her son's activities and "sometimes it was just easier to be here instead of driving home another hour-and-a-half at night." At the time of trial, she was working approximately 20 hours a week and earned $23 an hour.

Anita also assisted Timothy with the farming operation while they were married, although the extent of her involvement was disputed. Anita testified that she worked with livestock, helped

with irrigation, put up fencing, repaired pivots, and more. Conversely, Timothy testified that she helped with irrigation "[t]o a certain extent" and that "she was more a . . . go get parts type of person." Both parties agreed that Anita took over the books and records for the operation in the spring of 2017; Timothy took over when Anita left and moved to the townhome in Kearney in January 2020. Anita testified that her bookkeeping role ended around the time she filed for divorce because she "just wasn't physically there," and Timothy restricted her access to financial instruments utilized in the operation, such as access to bank accounts. According to Timothy, Anita "abandoned" the operation when she left and filed for divorce. Despite this, Anita claimed that Timothy reached out to her over a dozen times in 2020 and 2021 to discuss farming-related matters.

During the marriage, the parties relied primarily on an operating line of credit for their financial needs. They transferred funds from the line of credit to other accounts to cover expenses and repaid it with income mainly generated from the sale of crops and livestock. The parties purchased many assets during their marriage, which they paid for with the line of credit or through separate financing. If an asset was financed separately, they made payments using the line of credit and/or proceeds from the sale of crops and livestock. The parties renewed the line of credit each year during their marriage, and both Timothy and Anita signed the renewal documents. Anita continued to sign the renewal documents until February 2023. Both parties testified that they used the line of credit for personal expenses throughout the dissolution proceedings. Additionally, according to Anita, the parties received approximately "half-a-million to three-quarters of a million dollars" in "free Covid money" from the government that was deposited against the line of credit. Anita testified that she purchased an $8,000 pair of diamond and sapphire earrings "because we had free Covid money . . . so I went out and bought something that I know if I'm not paying extra from the free money, I went out and put it into some gold and diamonds." Timothy thought that the "Cares Act" funds were "somewhere around 4 and 500,000," but he was not certain. He did agree the funds were "[p]ut against . . . [their] line of credit."

In order to renew the line of credit, the parties were required to submit annual financial statements to the bank. Timothy's January 30, 2009, financial statement indicates that his individual net worth was $1,363,484 at that time. The parties' 2023 financial statement shows that their joint net worth was $3,806,248 just before trial. No evidence was presented regarding the origin of the values in the financial statements. However, Timothy admitted that the net worths were "deflated" because "the banks . . . don't want to overstate what you have."

The parties provided the district court with a signed joint property statement, exhibit 5, which contained Timothy's assigned values for assets and debts, as well as Anita's assigned values. The parties provided different valuation dates because Timothy wanted the court to use the date of separation (January 2020), while Anita wanted the court to use December 2022. Some of the assets and debts also reflected numbers taken from the January 2009 financial statement. Anita also offered exhibit 11 as a demonstrative exhibit because it highlighted in pink the items she wanted to be awarded and highlighted in blue the items she agreed should be allocated to Timothy. There were some discrepancies between exhibits 5 and 11, which we will address later.

The parties agreed that Timothy owned certain assets before their marriage. However, Timothy also asserted that he owned additional farm machinery, breeding livestock, prepaid expenses, and accounts receivable prior to marriage which were not accounted for in Anita's proposed equalization.

Anita provided detailed testimony regarding the assets and debts listed in the joint property statement. She explained her source for most of the listed assets and debts, indicating whether the item and value came from a financial statement, depreciation schedule, insurance declaration, through discovery, from an expert's opinion, or from another source. She further testified as to whether certain assets had been traded or sold, as well as which assets had been damaged by a fire and the eventual disposition of the insurance proceeds.

Timothy explained the sources of his valuations with less certainty. He testified that he adopted some of Anita's values and obtained others from financial statements. However, he admitted that some of the values were based solely on his opinion. He was also unsure whether certain premarital assets still existed at the time of trial and if not, where they had gone. Regarding Anita's valuations, Timothy testified that the values she obtained from the parties' insurance declarations did not represent the fair market value of the items. He explained that sometimes, he insures an item at its replacement cost, which is greater than its actual worth.

Anita's real estate appraiser, Roderick Stahly, provided testimony regarding the values of the real estate listed in section E of the joint property statement. Exhibit 10, Stahly's written report, was received into evidence. Stahly provided two valuation dates in his report: January 1, 2020, and January 1, 2023. His report states that the "purpose of the appraisal" was to determine the market value of the listed properties "based on market conditions prevailing" on those dates. Relying on Stahly's values, Anita's proposed values set forth in the parties' joint property statement show a value of $3,616,590, as of December 31, 2019, and a value of $4,623,545 as of December 31, 2022; this reflects an increase in value of $1,006,955 over those 3 years. Stahly testified that he provided those two valuation dates based on Anita filing for divorce in January 2020 and the trial not occurring until May 2023.

Stahly explained that the generally recognized methodologies used to appraise the fair market value of real estate are the cost approach, income approach, and sales comparison approach. He did not perform a cost approach analysis because it does not "indicate much" when appraising agricultural land without improvements. He performed an analysis using the income approach and sales comparison approach, but he felt the sales comparison approach was the "best indicator of value" on all the land parcels.

Timothy and Anita purchased two properties during their marriage: the townhome in Kearney, and a parcel of land in Furnas County, Nebraska. The other 14 parcels of real estate listed in the joint property statement were owned by Timothy, in whole or in part, prior to the marriage. However, after marrying Anita, Timothy executed and filed deeds transferring ownership of some of the parcels to include him and Anita. Timothy testified that Anita told him she would divorce him if he did not put her on the deeds because "she was being forced to sign note papers at the bank." Anita somewhat similarly testified, saying that she asked to have the real estate deeded to her "[b]ecause [she] was asked to be responsible for . . . loans and the debt against the ground." In most cases where Timothy's interest was 50 percent or less, it was Timothy's father, Jerry Petersen, who owned the remaining interest in the parcels. According to Anita, Timothy's father retired from farming and ranching in 2015.

Timothy transferred full ownership of the parties' "Cambridge home" -- to himself and Anita as tenants in common. Although Anita was granted an ownership interest in the Cambridge home, she testified that after she moved out and filed for divorce, Timothy allowed his older son

to move in without requiring him to pay rent. Timothy admitted that his son was living at the Cambridge home but stated that he was paying for utilities, maintenance, and insurance. He could not recall whether his son had paid him for insurance in 2023 but stated that his son did make the payment in 2022.

Pursuant to the district court's decree entered on July 20, 2023, Timothy was ordered to pay Anita a property equalization judgment of $3,277,101.89, with interest to accrue at the judgment interest rate of 7.494 percent per annum. The court largely adopted Anita's proposed division of property as set forth in exhibit 12, but declined to include as assets attributable to Timothy the $23,276.83 that Anita claimed Timothy paid towards expenses incurred by his former wife and the $2,875,500 in alleged missing grain.

After both parties timely filed motions to alter or amend the district court's judgment for various reasons, the court reviewed the record and issued an order amending the decree on September 20, 2023. The court clarified that it was approving the property division "as set forth in Exhibit 11, the color-coded Joint Property Statement and Exhibit 12, [Anita's] Proposed Balance Sheet." The court determined that Timothy's assets had been overstated by $101,164, but that he had also been given credit on a debt in two places. Ultimately, the court reduced the equalization judgment by $75,514 for an adjusted equalization amount of $3,201,587.87. Timothy filed a notice of appeal on October 19.

While the appeal was pending, Timothy paid Anita the entire equalization judgment, plus interest, because Anita had instituted an execution against his assets and a sheriff's sale was pending. Anita filed an acknowledgement and satisfaction of the money judgment on December 19, 2023, stating that Timothy paid her $3,295,501.77. She now argues that since Timothy "voluntarily chose to pay" the equalization judgment, he has rendered his appeal moot. Brief for appellee at 26. We previously granted Timothy leave to file an affidavit to support his argument that his payment was involuntary. On May 5, 2024, he filed an affidavit stating that "[b]ecause of [Anita's] efforts to collect the equalization judgment, [he] had no choice but to pay it or have all of [his] property sold at auction." He further stated that his satisfaction of the judgment "was involuntary and coerced by the legal process. Had [Anita] not made efforts to collect the equalization payment while [his] appeal was pending, [he] would not have made the payment as soon as [he] did."

Timothy's appeal is now before this court.

## III. ASSIGNMENTS OF ERROR

Timothy assigns, restated, that the district court abused its discretion by (1) including the appreciation of premarital land in the marital estate, (2) failing to include certain premarital assets in the marital estate that were used to pay off a premarital debt, (3) using the trial date rather than the separation date as the valuation date, (4) valuing and including certain property items in the marital estate, and (5) awarding Anita a money judgment rather than real property.

## IV. STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge in his or her determinations regarding custody, child support, division of property, alimony, and attorney fees.

*Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *Noland v. Yost*, 315 Neb. 568, 998 N.W.2d 57 (2023).

## V. ANALYSIS

### 1. MOOTNESS

Anita asserts that Timothy's payment of the equalization judgment renders his appeal moot. The law is clear that "'[w]hen an ordinary law action is pending in this court on appeal, and the parties by agreement settle and dispose of the whole controversy, it becomes, so far as this court is concerned, a moot case, and will not be further investigated, but will be dismissed.'" *D B Feedyards v. Environmental Sciences*, 16 Neb. App. 516, 526-27, 745 N.W.2d 593, 603 (2008) (quoting *Schlanbusch v. Schlanbusch*, 103 Neb. 588, 173 N.W. 580 (1919)). When a party voluntarily complies with the mandate of the trial court, satisfying the judgment, the appeal no longer presents an actual controversy, but an abstract question. *D B Feedyards v. Environmental Sciences, supra.*

The rule in Nebraska is that payment of a judgment does not destroy the right to appeal when the record shows that the payment was coerced by legal process during the pendency of the appeal. See, *Green v. Hall*, 43 Neb. 275, 61 N.W. 605 (1895); *D B Feedyards. v. Environmental Sciences, supra.* Payments have been found not to be voluntary when made to avoid a sale of property owned by the judgment debtor. See, *Burke v. Dendinger*, 120 Neb. 594, 234 N.W. 405 (1931); *Green v. Hall, supra.* Our rule requires a case-by-case examination of the facts. *Ray v. Sullivan*, 5 Neb. App. 942, 568 N.W.2d 267 (1997). The burden falls to the appellant to demonstrate, by affidavit, that appellant's satisfaction of the judgment was not voluntary, but was instead the result of coercion by legal process. See *id.*

This case closely resembles *Green v. Hall, supra*, where the appellant appealed a deficiency judgment of $3,578.10. An execution was issued to collect the appellant's debt by selling 116 of his lots. The sale was scheduled, but it did not occur, and the sheriff returned the execution as paid in full. The appellee moved to dismiss the appeal on the basis that the judgment had been fully and voluntarily paid by the appellant. In response, the appellant filed an affidavit asserting that the payments were not voluntary because they were made to prevent the sale of his property. The Nebraska Supreme Court recognized the principle that, if payment of a judgment appealed from is made under duress, the appeal should not be dismissed solely on the fact of such payment. The court further noted that because the appellant did not post a supersedeas bond to suspend the enforcement of the judgment, if the property had been sold, the purchaser would have acquired a vested title that would not have been affected by a reversal of the trial court's judgment. It therefore concluded that the appellant's payment was involuntary and overruled the motion to dismiss.

In this case, Timothy paid the entire equalization judgment during the pendency of the appeal but filed an affidavit stating that his payment was "involuntary and coerced by the legal process." The record reflects that Anita filed a "Praecipe for Execution" on October 16, 2023,

which set forth the judgment balance plus interest, costs, and attorney fees. An exhibit was attached listing all property to be executed upon, including real and personal property. According to Timothy, on November 9, "almost every piece of equipment [he] owned . . . had an orange sticker on it stating that the property was [seized on execution]." On December 18, he received a phone call from the Furnas County Sheriff, who stated that all of the property would be listed for sale on December 20. That same day, Timothy said that he "had no choice but to involuntarily pay [Anita] the full amount of the equalization [judgment]. . . . If [he] did not, the legal process would have proceeded, and all property listed in [Anita's] Praecipe for Execution would have been sold." Anita filed an acknowledgement and satisfaction of the money judgment the next day on December 19, stating that Timothy had paid the entire amount.

Anita argues that Timothy's payment precludes his appeal under the acceptance of the benefits rule, which states that an appellant may not voluntarily accept the benefits of part of a judgment in the appellant's favor and afterward prosecute an appeal or error proceeding from the part that is against the appellant. *Seldin v. Estate of Silverman*, 305 Neb. 185, 939 N.W.2d 768 (2020). To preclude appeal by the acceptance of the benefits of a divorce judgment, the acceptance of benefits must be of such a nature as to clearly indicate an intention to be bound by the divorce decree. See *id.*

The acceptance of the benefits rule only applies where the judgment benefits the party seeking to appeal and not where compliance is involuntary or compelled. See *Baker's Supermarkets v. Feldman*, 243 Neb. 684, 502 N.W.2d 428 (1993). See, also, *Becher v. Becher*, 299 Neb. 206, 908 N.W.2d 12 (2018) (acceptance of benefit rule did not apply where appellant executed quitclaim deeds to appellee to satisfy judgment while appeal was pending because appellant did not accept benefit, but rather involuntarily accepted detriment). Timothy did not accept a benefit by making an equalization payment of $3,201,587.87, plus interest. Rather, Anita accepted the benefit, while Timothy involuntarily accepted a detriment. Nonetheless, Anita argues that Timothy manifested his intent to be bound by the district court's judgment because he "took no steps to prevent the collection of the equalization payment" and "there is nothing in the record that indicates [he made] a request for a supersedeas bond." Brief for appellee at 26. She cites *D B Feedyards v. Environmental Sciences, supra*, to support her argument. In that case, the appellants' insurance company mistakenly paid the equalization judgment instead of a supersedeas bond, which the appellants sought and were granted permission to obtain. This court ultimately concluded that the payment was not voluntary and that the appellants clearly intended to appeal. The court noted that if it were to find for the appellants on appeal, repayment of the funds that the district court ordered to be disbursed to D B Feedyards could be enforced. We do not read *D B Feedyards v. Environmental Sciences, supra*, to require that a supersedeas bond be filed to establish that a payment was involuntary. In fact, the court stated that "even if the attempt to supersede was invalid, that is a separate and distinct question from whether the appeal is moot because of the 'voluntary' payment." *Id.* at 529, 745 N.W.2d at 604.

Further, if we find that the district court erred in how it handled the characterization and valuation of property and that an adjustment needs to be made to the equalization judgment, Anita would be in possession of the $3,295,501.77 she received. With such a significant amount paid to her at the end of last year, repayment to Timothy of any adjustment made to the equalization judgment would be feasible and enforceable.

We conclude that Timothy's payment was involuntary and thus does not render his appeal moot.

## 2. GENERAL PRINCIPLES OF LAW

Neb. Rev. Stat. § 42-365 (Reissue 2016) authorizes a trial court to equitably distribute the marital estate according to what is fair and reasonable under the circumstances. *Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023). In a marital dissolution action, the purpose of a property division is to distribute the marital assets equitably between the parties. *Id.* There is no mathematical formula by which property awards can be precisely determined, but as a general rule, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Id.*

The equitable division of property is a three-step process. *Id.* The first step is to classify the parties' property as either marital or nonmarital, setting aside the nonmarital property or nonmarital portion of the property to the party who brought the property to the marriage. *Id.* The second step is to value the marital assets and marital liabilities of the parties. *Id.* And the third step is to calculate and divide the net marital estate equitably between the parties. *Id.*

Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016). Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance. *Id.* Setting aside nonmarital property is simple if the spouse possesses the original asset, but can be problematic if the original asset no longer exists. *Id.* Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other spouse. *Id.* If the separate property remains segregated or is traceable into its product, commingling does not occur. *Id.* The burden of proof rests with the party claiming that property is nonmarital. *Id.*

With these general principles in mind, we turn to Timothy's assignments of error.

## 3. APPRECIATION OF LAND

Timothy claims the district court abused its discretion by including the appreciation of his premarital land in the marital estate. Timothy owned interests in numerous parcels of land prior to his marriage to Anita, all of which appreciated in value during the marriage. This is evidenced by Timothy's 2009 financial statement, the parties' joint property statement, and Stahly's appraised values for 2020 and 2023. Anita points out that she "only requested the value of the active appreciation of the land," and "did not include the total value" of all real estate "despite her right to do so as an owner of the intermixed marital property." Brief for appellee at 30. She claims that Timothy failed to present evidence that the property "only passively appreciated." *Id.*

The active appreciation rule sets forth the relevant test to determine to what extent marital efforts caused any part of an asset's appreciation or income. *Parde v. Parde, supra*. Accrued investment earnings or appreciation of nonmarital assets during the marriage are presumed marital unless the party seeking the classification of the growth as nonmarital proves: (1) The growth is readily identifiable and traceable to the nonmarital portion of the account and (2) the growth is not due to the active efforts of either spouse. *Id.* Appreciation caused by marital contributions is known as active appreciation, and it constitutes marital property. *Id.* Passive appreciation is appreciation caused by separate contributions and nonmarital forces. *Id.* Any given property can constitute a

mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property. *Id*. The original value of an asset may be nonmarital, while all or some portion of the appreciation of that asset may be marital. *Id*.

Some assets are more subject to active appreciation, while others are more subject to passive appreciation. *Id.* By its nature, real estate is more prone to passive appreciation. *Id.* This is because real estate tends to rise and fall in value for reasons beyond the parties' control. *Id.* Ultimately, whether appreciation in real estate is active or passive depends on the facts and circumstances of each case. *Id.* In that regard, evidence relating to the *cause* of appreciation is key. *Id.*

The burden is on the owning spouse to prove the extent to which marital contributions did not cause the appreciation or income. *Id.* The burden is not insurmountable; evidence that values of similar property in the same area had increased by a particular percentage during the marriage or evidence that the parties left the land untouched over the course of the marriage could provide a basis to treat the appreciation as nonmarital. See *Parde v. Parde, supra*. On the other hand, the "'continued profitability of a farm operation'" may serve to "'increase the land's value, particularly where the only apparent use of the land is farming.'" *Id*. at 791, 986 N.W.2d at 514 (quoting *Fickle v. Fickle*, 287 S.W.3d 723, 730-31 (Tenn. App. 2008)). "'The routine advance of expenses for the farming operation is . . . a real and substantial contribution made through the use of the [parties'] marital funds.'" *Parde v. Parde*, 313 Neb. at 791-92, 986 N.W.2d at 514 (brackets in original).

In the decree, the district court stated that Anita was "actively involved in the management of the farming operation" and that she had been "obligated on loans related to the farming operation." It noted that while Timothy "deeded an interest to [Anita] for a number of the real estate parcels," that was "not in itself dispositive of the issue," but was "further evidence weighing against a finding of separate marital property." The court concluded that Timothy failed to meet his burden of proof that the "growth of the marital estate [was] readily identifiable and traceable to nonmarital assets and that such growth was not due to the active efforts of either spouse." We disagree with the first portion of the court's conclusion regarding the traceability of nonmarital assets, at least insofar as it relates to the real estate at issue. There was no disagreement between the parties about what real estate had been owned by Timothy prior to the marriage. Therefore, the issue to be resolved with regard to the real estate at issue in this assigned error, was whether the increased values on Timothy's premarital real estate was the result of active or passive appreciation. Neither party challenged the income earned from the farming and ranching operations on the premarital land; rather, the dispute focused on merely the appreciation in value of the land itself.

The only expert testimony adduced at trial regarding land value and appreciation came from Stahly, Anita's real estate appraiser. He was only hired to address the value of the real estate at the time the parties separated in January 2020 and any appreciation in those values closer to the time of trial in 2023. He stated that "leaving [crop] ground fallow might improve the soil quality and the productivity." However, when asked if he could definitively explain the impact of working the ground versus not working the ground, he replied "No." Stahly acknowledged that interest rates had "gone up considerably" since January 2020, and he agreed it could have an effect on land

value. Stahly also testified about the appreciation of the parties' pastureland from 2020 to 2023. The following colloquy occurred during cross-examination by Timothy's counsel.

[Counsel]: And is pasture land [sic], would that have the same value if the pasture land [sic] is left untouched?

[Stahly]: It could be increased.

[Counsel]: Did you show it being -- show an increase in your valuation from January 1st, 2020[,] to January of 2023?

[Stahly]: Yes.

[Counsel]: And what was the basis of that increase?

[Stahly]: Based on the information I obtained from comparable sales.

[Counsel]: Market forces?

[Stahly]: Market forces, cattle prices were good.

[Counsel]: Anything besides market forces indicate that increase in pasture land [sic] value?

[Stahly]: Well, somebody's buying the land for whatever reason, could be investors.

Stahly did not discuss the appreciation of the land from the time of the parties' marriage in December 2008 until they separated in January 2020. In fact, he stated that he did not review any information about Timothy's premarital assets.

Timothy testified that the appreciation of his farmland "isn't due to anything besides market forces." He claimed the increased value of the land was not the result of any active efforts. When asked if he had done anything to increase the value of the properties since he married Anita, his response was, "Just maintenance." No further explanation was provided as to what "maintenance" meant, nor did Timothy provide any evidence of values of similar property in the same area increasing by similar percentages during the marriage. And as noted earlier, the continued profitability of a farm operation may serve to increase the land's value, including the routine advance of expenses for the farming operation made through the use of the parties' marital funds. See *Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023).

With one exception, which we will discuss in the next paragraph, we cannot say that the district court abused its discretion in finding that Timothy failed to rebut the presumption that the appreciation of the real estate was marital. The parties continued to use a shared line of credit while the divorce was pending, thus continuing Anita's contributions to sales and costs, taxes, insurance, and other routine expenses of farming. Timothy's testimony about market forces failed to lay any foundation for his assertion, and he failed to explain what "[j]ust maintenance" meant in terms of active or passive appreciation. As such, other than the exception we discuss next, we find that the district court did not abuse its discretion in concluding that Timothy failed to prove that the increased value in his premarital real estate was the result of active appreciation, and thus was marital.

The one exception related to appreciation on Timothy's premarital real estate comes from Stahly's testimony on cross-examination, that we set forth above. When Stahly was asked what caused the increase in the valuation of pastureland from January 2020 to January 2023, Stahly answered, "Market forces, cattle prices were good." When asked if anything besides market forces

increased the value of the pastureland, Stahly responded only, "Well, somebody's buying the land for whatever reason, could be investors." We conclude that based on Stahly's expert testimony attributing the increased value of the pastureland only to market forces or investors, this evidence supports passive rather than active appreciation on Timothy's premarital pastureland. Stahly had been established as an expert to testify about the real estate values and had explained how he had arrived at various values based upon other comparable real estate sales. However, we also observe that Stahly's responses set forth above only pertained to pastureland. He was not asked, nor did he otherwise testify regarding market forces impacting the increased values for the homestead, the irrigated cropland, the dry cropland, and the recreational/timber parcel from January 2020 to January 2023. Therefore, the evidence supports reducing only the increased value of the premarital pastureland from January 2020 to January 2023.

To determine the amount of the reduction, we turn to the real estate identified as parcels 1 through 15 in exhibit 10 (Stahly's appraisal), which correlates with items 1 through 15 in exhibit 5, section E. In exhibit 5, Anita used Stahly's January 2023 values when calculating the total marital real estate ($4,449,045). She then carried that value over to exhibit 12, her proposed allocation and valuation of the marital estate. Based on Stahly's appraisal, parcels 1, 3, 4, 6, 7, 8, 9, 10/11, 12, and 15 can be identified as reflecting an increase in value for pastureland. Parcel 2 did not separately value any pastureland, parcel 3 should not be included since it was purchased during the marriage, parcel 5 showed no increase in pastureland value, and consolidated parcel 13/14 consisted of recreational/timber acres only. We set forth below the change in pastureland values from January 2020 to January 2023 for Timothy's premarital real estate, one of which he had a 100-percent interest in; others a 50-percent interest.

|  | Jan 2020 | Jan 2023 | Increased Value |
|---|---|---|---|
| Parcel 1 (100%) | $100,800 | $123,200 | $22,400 |
| Total: | $100,800 | $123,200 | $22,400 |
|  |  |  |  |
| Parcel 4 (50%) | $84,600 | $94,000 | $9,400 |
| Parcel 6 (50%) | $55,800 | $68,200 | $12,400 |
| Parcel 7 (50%) | $141,300 | $172,700 | $31,400 |
| Parcel 8 (50%) | $68,400 | $83,600 | $15,200 |
| Parcel 9 (50%) | $8,400 | $23,100 | $14,700 |
| Parcel 10/11 (50%) | $170,100 | $207,900 | $37,800 |
| Parcel 12 (50%) | $87,300 | $106,700 | $19,400 |
| Parcel 15 (50%) | $81,250 | $99,000 | $17,750 |
| Total: | $697,150 | $855,200 | $158,050 |
|  |  |  | x .50 |
|  |  |  | $79,025 |

Total = $101,425 ($22,400 + $79,025) increased value on pastureland from January 2020 to January 2023.

As a result of these adjustments, Timothy's total marital estate should be reduced by $101,425. We will reflect this reduction in the table included in the next section.

4. PREMARITAL DEBT AND ASSETS

Timothy assigns as error the district court's inclusion as an asset Timothy's premarital debt of $928,505 owed to First Central Bank (Cambridge) in light of its failure to include the premarital assets he claims were associated with that debt. However, we initially observe a matter of plain error that ties into Timothy's assigned error and ultimately renders it moot. Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *Noland v. Yost*, 315 Neb. 568, 998 N.W.2d 57 (2023).

We begin with the proposition that the equity in property at the time of marriage is a nonmarital asset which, if established, should be set aside as separate property. See *Parde v. Parde, supra*. In the present case, the district court relied upon exhibits 11 and 12 when apportioning and valuing the marital and premarital assets and liabilities between the parties. Exhibit 11 was represented to be an unsigned replica of exhibit 5 (the parties' signed joint property statement), but with pink and blue highlights designating Anita's proposed allocation of property; it was received for demonstrative purposes only. However, as observed earlier, there were changes made in exhibit 11. Notably, exhibit 5, section K (Timothy's premarital assets), contained lines 34 to 38, which set forth premarital values for farm machinery and automotive ($370,600), breeding livestock ($315,200), prepaid expenses ($151,600), and accounts receivable ($35,500); these premarital assets totaled $882,900. However, exhibit 11, section K, did not contain lines 34 to 38 and therefore these premarital assets previously acknowledged and signed off on by both parties had been removed by Anita. The district court stated that it approved the division of property as set forth in exhibits 11 and 12, and it is in the court's reliance on certain values contained in those exhibits that we find plain error.

Anita's exhibit 12 reflects Timothy's alleged premarital assets totaling $1,570,146, and then also includes Timothy's alleged premarital debts of $1,753,694.72. That results in Timothy having a net worth of [-$183,548.72] at the time of marriage, which is contrary to the information contained in First Central Bank's January 30, 2009, financial statement (exhibit 6). Both parties testified that they relied upon exhibit 6 to determine certain premarital values. Exhibit 6 shows Timothy having a net worth of $1,363,484 at the time of marriage. Our summary of that document reflects the following:

Total Current Assets: $690,957
Total Current Liabilities: $691,496
**Equity: [-$539]**
(Current assets include cash; prepaid expenses; accounts receivable; livestock for sale; grain, hay, and supplies; growing crops. Current liabilities include notes to First Central Bank, accrued interest, accounts payable, other notes/loans.)

Total Intermediate Assets: $1,123,115
Total Intermediate Liabilities: $327,281

**Equity: $795,834**
(Intermediate assets include breeding livestock, machinery and equipment, other investments, insurance. Intermediate liabilities include loans associated with intermediate assets.)

Total Fixed Assets: $1,158,713
Total Fixed Liabilities: $590,524
**Equity: $568,189**
(Fixed assets and liabilities relate to real estate.)

Total Assets: $2,972,785
Total Liabilities: $1,609,301
**Net Worth: $1,363,484**

Timothy's equity or net worth of $1,363,484 at the time he married Anita was erroneously reduced to a negative net worth on exhibit 12 due to Anita adding $1,753,694.72 in alleged premarital debt back into the marital estate, much of which is attributable to Timothy's premarital real estate. However, based on Timothy's premarital assets and liabilities as reflected in the financial statement at the time of marriage (exhibit 6), the question is what assets or equity existing at that time can be sufficiently traced and accounted for at the time of the parties' divorce. Whatever premarital equity Timothy had at the time of marriage that can be sufficiently traced should be set off against the marital assets allocated to Timothy. All other premarital assets and liabilities that cannot be traced are simply absorbed into the marital estate. In fact, Anita responded, "Yes," when asked by her counsel, "So it doesn't matter whether it was debt that [Timothy] had before you were married that got refinanced or whether it's machinery and equipment that got termed out, everything that's owed to Farm Credit is secured with everything you and [Timothy] own, either whether before marriage or during the marriage, true?" In other words, of the $1,363,484 in premarital equity (assets less liabilities) that existed at the time of marriage, only the traceable premarital equity is relevant since all other premarital assets and liabilities flowed into the marital estate.

We conclude that there is no question that Timothy had traceable premarital equity of $568,189 in all his real estate interests at the time of his marriage to Anita. At a minimum, his share of the marital estate should have been reduced by that amount before calculating the marital equalization judgment. And as indicated in the previous section of our opinion, the allocation of $4,449,045 in marital real estate value should be reduced by $101,425 based upon Stahly's testimony establishing market forces or passive appreciation as the only cause of the increased value on Timothy's premarital pastureland from January 2020 to January 2023.

Whether to set off any other premarital asset or equity is less clear, although we conclude the breeding livestock is sufficiently traceable to set aside a premarital interest of $315,200. Because Timothy includes that specific premarital property in a separate assigned error, we will address it later in our opinion but will include the adjustment in the table below.

As to other premarital assets, Timothy was uncertain whether they still existed at the time of trial and if not, where they had gone. When asked about the premarital farm machinery, he

stated, "Well, it's probably all been recycled." He then admitted that he was unable to confirm how much of the equipment still existed at the time of trial. Timothy further stated that the prepaid expenses were used up in 2009 and that he could not recall whether the accounts receivable had been collected. He stated, "I'm sure it was." Because no evidence was presented regarding the existence of the premarital farm machinery, prepaid expenses, and accounts receivable at the time of trial or whether their proceeds were used to pay off the line of credit, Timothy did not meet the burden of proof required to have those premarital assets included in the equalization calculation. See *Osantowski v. Osantowski*, 298 Neb. 339, 351, 904 N.W.2d 251, 263 (2017) ("Setting aside nonmarital property is simple if the spouse possesses the original asset, but can be problematic if the original asset no longer exists. . . . The burden of proof rests with the party claiming that property is nonmarital.").

In summary, we conclude that the following adjustments should be made to the marital equalization calculations: (1) Timothy's premarital equity of $568,189 (real estate equity at time of marriage) should be set off from the total of his marital assets; (2) $101,425 in passive appreciation on his premarital pastureland from January 2020 to January 2023 should be set off against his marital assets; (3) $315,200 (breeding livestock) should be set off against his marital assets; and (4) no premarital liabilities should be added back into the equation since all remaining premarital assets and liabilities were absorbed into the marital estate, which is evidenced by the significant equalization owed by Timothy to Anita. We set forth our adjustments in the tables below.

We begin by using the numbers represented on exhibit 12 (Anita's proposed valuation and allocation of assets and liabilities), as adjusted by the district court in its initial decree.

|  | HUSBAND | WIFE |
| --- | --- | --- |
| Total Assets | ~~$12,448,940.54~~ | $652,021.31 |
| Adjusted in Decree | $9,550,163.71 | |
| | | |
| Total Liabilities | [$2,544,683.12] | [-1,418.11] |
| | | |
| Less: | | |
| Premarital Assets | 1,570,146 | $18,613.89 |
| | | |
| Plus: | | |
| Premarital Debts | $1,753,694.72 | -0- |
| NET MARITAL ESTATE | ~~$10,087,806.14~~ | $634,825.53 |
| Per Decree | $7,189,029.31 | |

Equalization: $7,189.029.31 - $634,825.53
= $6,554,203.78 ÷ 2
= $3,277,101.89 equalization

- 14 -

We now set forth the adjusted numbers above, as modified in this opinion.

|  | HUSBAND | WIFE |
|---|---|---|
| Total Assets | $9,550,163.71 | $652,021.31 |
| Total Liabilities | [$2,544,683.12] | [-1,418.11] |
| Less: | | |
| Premarital Assets | ~~1,570,146~~ | $18,613.89 |
| Per this opinion | $568,189 (real estate equity) | |
| Per this opinion | $315,200 (breeding livestock) | |
| Per this opinion | $101,425 (pastureland 2020-23) | |
| ~~Plus:~~ | | |
| ~~Premarital Debts~~ | ~~$1,753,694.72~~ | ~~-0-~~ |
| NET MARITAL ESTATE | ~~$7,189,029.31~~ | $634,825.53 |
| | $6,020,666.59 | |

Equalization:  $6,020,666.59 - $634,825.53
              $= \$5,385,841.06 \div 2$
              $= \$2,692,920.53$ modified equalization

Additionally, the district court's September 20, 2023, order amending the decree found a net adjustment in Timothy's favor in the amount of $75,514, which the court deducted from the initial equalization amount. This resulted in an amended equalization judgment of $3,201,587.87. Neither party appealed or cross-appealed from that decision, and we therefore apply that reduction in the same manner here. Subtracting $75,514 from our calculated equalization judgment of $2,692,920.53 results in a modified equalization judgment of $2,617,406.53. That means Timothy has overpaid Anita by $584,181.34, plus interest. Anita is directed to reimburse Timothy $584,181.34, plus interest at 7.494 percent per annum, to be calculated from the date of the initial decree.

## 5. VALUATION DATE

We next address Timothy's argument regarding the valuation date. He contends that the district court abused its discretion "by using trial date replacement values for marital property rather than [the] separation date fair market value determined from bank records or Appellant's informed testimony." Brief for appellant at 6. Timothy bases his argument on the fact that Anita used the "replacement value of items of property rather than the liquidation value or fair market value of the property." Brief for appellant at 19.

The purpose of assigning a date of valuation in a dissolution decree is to ensure that the marital estate is equitably divided. *Radmanesh v. Radmanesh*, 315 Neb. 393, 996 N.W.2d 592 (2023). It is well settled that, generally, the date upon which a marital estate is valued must be

- 15 -

rationally related to the property composing the marital estate and the property being divided. *Id.* The date of valuation is reviewed for an abuse of the trial court's discretion. *Id.*

The district court did not abuse its discretion by using Anita's trial date valuations. Throughout the dissolution proceedings, the parties continued to use the line of credit and shared credit cards, just as they had prior to the filing for divorce. Additionally, most of the income that was generated from the farming operation was used to pay off the line of credit and other joint financial obligations. The parties also received separate COVID funds during the dissolution proceedings, which they both agreed were deposited into their line of credit. Considering all these factors, we cannot say it was an abuse of discretion for the district court to value the parties' assets as of the trial date.

Further, while Anita relied on credible sources to determine the values of the marital estate and provided detailed explanations of where the values came from, Timothy failed to explain where many of his values came from and even neglected to assign values to some items. Timothy indicated that he arrived at some values using financial statements but admitted that some were based solely on his opinion. Rather than speculate on the origins of these figures, the district court opted to utilize the verifiable amounts proposed by Anita. We find no error with this decision.

### 6. SPECIFIC PROPERTY

Timothy argues that the district court erred in classifying and valuing specific items of property in the marital estate.

### (a) Jerry Petersen Trucking, Inc.

Jerry Petersen Trucking is a trucking corporation that the parties owned to primarily haul their own livestock and grain. At the time of marriage, Timothy owned a 50-percent interest in the corporation, with his father owning the other half. Timothy's father subsequently gifted his half of the corporation to Timothy, who then granted a 50-percent interest to Anita during their marriage. The district court valued the corporation at $214,082 -- the 2023 value provided by Anita. Timothy argues that it should have been valued at $90,784 because "the only value it has is the value of the trucks it utilizes to support the farming operation. There is no goodwill or other tangible property associated with the entity." Brief for appellant at 20.

> Anita testified about where she got her 2023 value for Jerry Petersen Trucking. She stated: I went through the checking account. I figured what the balance was at the end of the year. I went through and figured if there were any deposits that were 2022 income that weren't deposited until after the first of the year. I took out any outstanding checks, and I put values on the machinery and the equipment that the company owns.

She testified that the corporation increased in value by roughly $60,000 after filing for separation in 2019 because new pickups and semi-trailers were purchased. Additionally, "there was more money sitting in the checking account at the end of the year." She could not recall whether there was a loan for the newly purchased assets.

When Timothy was asked where he got his $90,784 value for the corporation, he responded, "I think the trucking statements, financial statement." He also said, "[T]here's been two pickups added to it after the separation, a 2011 Ford for $8,000 on an auction, and a 2011 Ford

for $13,000 after -- at an auction." He further testified that a fire destroyed a semi-trailer in 2021, so he purchased another one in its place using the insurance proceeds. During cross-examination, Timothy admitted that at the time of trial, the corporation had $90,000 in "hard assets" and $40,000 in its checking account.

Earlier, we found that the district court did not err in using the trial date rather than the separation date in valuing the parties' assets. Timothy did not include a 2023 value for Jerry Petersen Trucking, and he clearly did not include the corporation's checking account funds in his valuation. As such, we find that the district court did not abuse its discretion by valuing Jerry Petersen Trucking at $214,082.

### (b) Republican Valley Hospital, Inc.

Republican Valley Hospital is an entity that owns land which the parties rented and farmed. Timothy owned a 25-percent interest in the corporation prior to marriage, and its value has since appreciated. According to Anita, the entity had a loan in 2008, and Timothy was paying 25 percent towards that obligation. That loan was subsequently refinanced "[i]nto Farm Credit," and payments were "coming off the line of credit," which was funded with the annual sales of grain and livestock. Anita testified that she was not given an interest in Republican Valley Hospital. Pursuant to Anita's proposed distribution of property, the district court awarded Timothy credit for the premarital value of Republican Valley Hospital but included its appreciation in the marital estate. Timothy argues that the court erred by including its appreciation in the marital estate.

Timothy did not provide any testimony regarding the appreciation of Republican Valley Hospital. Anita testified that the parties used the line of credit to pay for expenses related to the corporation. As such, we conclude that the district court did not abuse its discretion by including its appreciation in the marital estate. See *Parde v. Parde*, 313 Neb. 779, 788, 986 N.W.2d 504, 512 (2023) ("[a]ccrued investment earnings or appreciation of nonmarital assets during the marriage are presumed marital unless the party seeking the classification of the growth as nonmarital proves: (1) The growth is readily identifiable and traceable to the nonmarital portion of the account and (2) the growth is not due to the active efforts of either spouse").

### (c) Premarital Breeding Livestock

Timothy argues that the district court should have set aside the premarital value of his breeding livestock (exhibit 5, section K, line 36, $315,200) against the "current" value of breeding cattle listed in exhibit 11, the joint property statement used by the court to calculate the marital equalization. Brief for appellant at 21. Exhibit 11, section D, item 106a reflects a December 31, 2022, value of $370,500 for 305 breeding cows. Exhibit 6, the January 30, 2009, financial statement reflects a value of $315,200 for 360 breeding cows. We agree that Timothy's premarital value for the breeding livestock should have been set off against his other assets.

Certain types of marital assets are more traceable than others. See *Osantowski v. Osantowski*, 298 Neb. 339, 904 N.W.2d 251 (2017). In *Sellers v. Sellers*, 294 Neb. 346, 882 N.W.2d 705 (2016), the Nebraska Supreme Court held that based on the totality of the circumstances, a cattle herd owned at the time of marriage can be treated as a single asset for tracking purposes and set off from the marital estate as separate property if such a result is equitable. In *Sellers*, the husband was engaged in the cattle business throughout the parties'

marriage. At the time of the marriage, he owned cattle valued at approximately $130,000, but by the time of divorce, it had grown to over $600,000. The husband bought additional cattle during the marriage using an inheritance. The wife argued that the cattle operation had become marital property because the increase in value was due to the husband's buying and selling of cattle during their marriage, which was often financed through a line of credit held in both of their names.

The husband testified that the increased value was due to market forces and provided evidence which allowed the trial court to trace the portion of his inheritance that was used to purchase cattle. Based on this evidence, the Nebraska Supreme Court found that the trial court appropriately treated the husband's cattle as separate property. The court recognized that

> one cannot draw a straight line from a cow owned [at the time of marriage] to a cow owned [at the time of divorce,] which is the prototypical "tracing" of a premarital asset so as to set it aside to the party who owned it at the time of marriage. But . . . the "disposable" nature of a cow does not, by itself, mean that a set-aside for preowned cattle is not allowable. Instead . . . the issue is resolved according to the particular facts of the case.

*Id.* at 354, 882 N.W.2d at 711-12 (quoting *Shafer v. Shafer*, 16 Neb. App. 170, 741 N.W.2d 173 (2007)). The court further noted that treating a cattle herd as a single asset -- rather than taking a "cow by cow" approach to the tracing issue -- "acknowledge[s] the realities of what happens over time in a cattle operation." *Id.* at 355, 882 N.W.2d at 712 (quoting *Shafer v. Shafer, supra*).

In this case, Timothy valued his premarital breeding livestock at $315,200, which he obtained from his 2009 financial statement. A review of the financial statement supports this value. Anita valued the parties' "breeding cows" at $370,500 in 2023. Although Timothy was uncertain whether any of his premarital breeding livestock existed at the time of trial, this fact does not preclude a set-aside under *Sellers v. Sellers, supra*. Timothy testified as to the premarital value of his cattle and the parties clearly sold and bought new cattle throughout their marriage. We therefore find that the district court abused its discretion by not setting aside Timothy's premarital breeding livestock against the current value of the parties' cattle. We have already included an adjustment for this premarital asset in our equalization calculation table earlier in the opinion.

### 7. MONEY JUDGMENT

Timothy argues that the district court should have awarded Anita real property rather than a money judgment because "the judgment that was immediately due from the [d]istrict [c]ourt bore interest at a non-insignificant amount and it would not be speculative to assume that any loan or sale of property would significantly reduce the net-value of the asset received by the party that was awarded the property." Brief for appellant at 22.

The purpose of a property division is to distribute the marital assets equitably between the parties. *Parde v. Parde, supra*. When ordering an equitable division, the polestar is fairness and reasonable as determined by the facts of each case. See *id.*

In *Kellner v. Kellner*, 8 Neb. App. 316, 333, 593 N.W.2d 1, 12 (1999), this court pointed out that "[i]n an agrarian state such as Nebraska, people who are associated with agriculture generally regard the continued ownership of land as very important. It is not reasonable for a court in a dissolution action to unnecessarily interfere with the respective desires of the parties and their way of life." Further, in *Plog v. Plog*, 20 Neb. App. 383, 496, 824 N.W.2d 749, 766 (2012), the

court stated that it is "simply unrealistic to expect a divorced couple located in two states to jointly, cooperatively, and successfully operate a smallish farming/ranching operation." In that case, the court found that "there was no compelling evidence introduced that [the appellee] should own land which adjoins land that [the appellant] intends to continue to use to earn his living and satisfy the financial obligations resulting from the divorce." *Id.*

In this case, Timothy had been involved in the farming business for quite some time. He started farming in the early 1990s and continued to farm throughout the parties' marriage and after their separation. Although he argues that the district court should have awarded Anita property in lieu of a money judgment, there was no evidence presented at trial showing that he wanted to part with the land, nor what tax consequences he might incur if he had to sell any of the property to satisfy an equalization judgment. In fact, his proposed property division does not indicate who he wanted to receive the land.

It was within the district court's discretion to determine that awarding Anita property would have been unreasonable under the circumstances. It could have reasonably found that such an award would have interfered with Timothy's way of life. Therefore, we find that the district court did not abuse its discretion by awarding Anita an equalization money judgment.

## VI. CONCLUSION

Because we found errors in how the district court calculated Timothy's premarital equity, we modify the equalization judgment from $3,201,587.87 to $2,617,406.53. Since Timothy has already paid the prior equalization judgment in full, including with interest, Anita is ordered to reimburse Timothy $584,181.34, plus interest at 7.494 percent per annum, to be calculated from the date of the decree. We otherwise affirm the district court's July 20, 2023, decree and its September 20 order amending the decree.

AFFIRMED AS MODIFIED.